SHADES, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 76-11-02546

Before FORD, *Judge.*

---

(Decided September 14, 1982)

*Glad, Tuttle & White (Stephens S. Spraitzar* and *Gary Cooper* at the trial and on the brief) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Robert H. White,* at the trial and on the brief), for the defendant.

FORD, *Judge:* This action presents to the court for determination the proper classification of certain ramin matchsticks or rounds. The merchandise was classified by customs as articles of wood, not specially provided for, under item 207.00, Tariff Schedules of the United States, as modified by Presidential Proclamation 3822, T.D. 68/9, and assessed with duty at 8% ad valorem. Plaintiff contends said material is worked or dressed lumber within the definition contained in Schedule 2, Subpart B, Headnote 2(a) (ii) or (iii) and, accordingly, is properly subject to classification under item 202.46, TSUS, as modified, supra. All other claims contained in the complaint, having been abandoned, are dismissed.

The statutory provisions and headnotes pertaining to this merchandise read as follows:

207.00   Articles not specially provided 8% ad val.
      for, of wood.

> Lumber, rough, dressed, or worked (including softwood flooring classifiable as lumber, but not including siding, molding, and hardwood flooring):.

Hardwood:      * * *
Other:        * * *

202.46     Dressed or worked ........................... Free

## SUBPART B—LUMBER, FLOORING AND MOLDINGS

### SUBPART B HEADNOTES

\*     \*     \*     \*     \*     \*     \*

2. For the purposes of this part, the following terms have the meaning hereby assigned to them:

(a) *Lumber:* A product of a sawmill or sawmill and planing mill derived from a log by lengthwise sawing which, in its original sawed condition, has at least 2 approximately parallel flat longitudinal sawed surfaces, and which may be rough, dressed, or worked, as set forth below:

> (i) Rough lumber is lumber just as it comes from the saw, whether in the original sawed size or edged, resawn, crosscut, or trimmed to smaller sizes;
> (ii) Dressed lumber is lumber which has been dressed or surfaced by planing on at least one edge or face; and
> (iii) Worked lumber is lumber which has been matched (provided with a tongued-and-grooved joint at the edges or ends), shiplapped (provided with a rabbeted or lapped joint at the edges), or patterned (shaped at the edges or on the faces to a patterned or molded form) on a matching machine, sticker, or molder.

Edge-glued or end-glued wood over 6 feet in length and not over 15 inches in width shall be classified as lumber if such wood as a solid piece without glue joints would be deemed to be lumber as defined above.

\*     \*     \*     \*     \*     \*     \*

(c) Hardwood: Wood from trees of non-coniferous species.

The record consists of the testimony of three witnesses called on behalf of plaintiff as well as the receipt in evidence of ten exhibits. Defendant presented the testimony of one witness. The official papers were received in evidence without being marked.

The first witness called on behalf of plaintiff was Leland Paschick, who was formerly president and plant manager of the importing company. His present business, "Shades II", has no relationship to the importer, but does deal in the same type of merchandise. While employed by the importer, the witness visited the

factories in Japan and Taiwan where the imported merchandise was made. The manufacturing steps in both countries remained substantially the same between 1950 and 1970.

According to the witness, the material from which the imported articles are made is ramin wood procured from Indonesia and Malaysia. The raw material used by the foreign producer is rough cut lumber in dimensions of 2″ x 2″, 2″ x 4″, and 2″ x 6″, all being 12 or 13 feet long. This lumber is then processed by passing it through a gang rip saw which produces an article 2″ in width and the thickness of about 3 millimeters. In addition, according to the witness, the merchandise is passed through a molding machine resulting in the production of a 3.7 millimeter round reed. The reed is then placed in a shaker which smooths and cleans rough fibers from it. They are then cut into the specified lengths which had been ordered and packaged. After packaging nothing further is done to them prior to importation into the United States. The photographs received in evidence as Plaintiff's Exhibit 3 depict the process of manufacture.

After importation the reads are painted, stained, or left in a natural form and are run through another shaking machine. The painting and staining involves immersing the reeds in a bath of paint or stain and allowing it to drain off. The next step utilizes a heater to dry the rounds which are then woven with small wood slats and warp yarns. The woven roll goods are sold to converters who fabricate them into window shades or custom-ordered draperies, folding doors, room dividers, wall coverings, and other products. These rolls are generally sold as "woven woods" in width of 8′, 10′ and 12′ and in lengths of 50′ to 60′.

The jobbers in manufacturing the shades or drapes cut a portion of the roll, which is then mounted on a wooden head rail or on a spring roll.

According to Mr. Paschick the imported merchandise was worked lumber since it was patterned by the molding machine.

Plaintiff called Mr. James R. Brice, President of Brice Tool and Stamping Company, whose business is the building and designing of tools and stampings. The witness designed molding machines and the company has manufactured milling machines. While the witness admitted he was not an expert in the lumber industry, he was well qualified as an engineer. He identified the machines depicted in Exhibit 3F, G and H as molding machines similar to those manufactured by another California company. It is the professional opinion of Mr. Brice that the imported ramin lumber is patterned on a molder. The molder shapes the lumber at the edges.

Plaintiff's third witness, Patrick Bennett, is president of Trans-Pacific Wood Company, engaged in the importation of forest products. He has been in the wood products industry for approximately 20 years. The witness agreed with the definition of lumber set forth in the headnotes, as well as the definition of worked lumber. It was

his opinion that the imported merchandise falls within the definition of worked lumber.

Defendant called Wilbur L. Johnston, Director of Architectural Services at the Woodwork Institute of California, which is a non-profit corporation for promotion of better quality millwork and architectural wood products in the State of California. The witness agreed that the merchandise at bar, as well as the slats, were worked lumber since they were made on a molder.

In the field of customs jurisprudence it is axiomatic that plaintiff has a dual burden of proof. 28 U.S.C. 2639(a)(1). Therefore, plaintiff must establish the classification under item 207.00, TSUS, to be erroneous and that classification under item 202.46, TSUS, is proper. In order to accomplish the latter, plaintiff must establish the imported merchandise to be hardwood lumber as defined in headnote 2(c) subpart B, part 1, schedule 2, TSUS. Plaintiff must also establish the merchandise to be either worked lumber or dressed lumber as defined by said headnote 2(a) (see subheadings (ii) and (iii)).

Plaintiff, by its request for admission, received in evidence as plaintiff's exhibit 1, has established the merchandise to be hardwood. Paragraph 9 of said exhibit admits the imported merchandise is wood obtained from a tree of a non-coniferous species which conforms to the definition of hardwood as set forth in the headnote, supra.

Defendant contends the imported merchandise does not conform to the definition of lumber contained in the headnote, supra. In order to conform, defendant contends the lumber cannot be round since the definition states "in its original sawed condition, has at least 2 approximately parallel flat longitudinal surfaces * * *." This theory was urged in *A. N. Deringer, Inc.* v. *United States,* 61 Cust. Ct. 66, C.D. 3530 (1981) and discarded as indicated in the following observation:

> Nor is it any bar to the classification of the imports as lumber that their longitudinal surfaces are not parallel. The statutory requirement of parallelism imposed by headnote 2(a) applies only to lumber "in its *original* sawed condition * * *" [emphasis supplied], and the record clearly establishes that "in their original sawed condition" the imports possessed two parallel flat surfaces. Also significant is the "Brussels Nomenclature" which—as the Tariff Commission pointed out—had an important influence on the arrangement of the proposed revised tariff schedules. *Tariff Classification Study, Submitting Report* (1960), p. 8. To the extent relevant, the Brussels Nomenclature states:
>
> 44.05—Wood Sawn Lengthwise, Sliced or Peeled, but not Further Prepared, of a Thickness Exceeding Five Millimeters
>
> With a few exceptions, this heading covers all wood and timber, of any length but of a thickness exceeding 5 mm., sawn

along the general direction of the grain or cut by slicing or peeling, but not further worked \* \* \*.

\*    \*    \*    \*    \*    \*    \*

It is to be noted that sawn timber falling within this heading *need not necessarily be of rectangular section* nor of uniform section along the length.[5] [Emphasis supplied.]

The "sawn timber" referred to is the counterpart of "lumber" provided for in the Tariff Schedules of the United States, and (as the above quotation reflects) the mere fact that its cross section (as here) is triangular rather than rectangular (and its longitudinal surfaces thus not parallel) does not preclude its classification as lumber.

[5] Vol. II, *Explanatory Notes to the Brussels Nomenclature* 1955, Ch. 44, pp. 413–14 (1964 ed.). [P. 74.]

The testimony adduced herein establishes the imported merchandise was derived from 2″ x 2″, 2″ x 4″ or 2″ x 6″ lumber in lengths of 12′ and 13′. By use of gang rip saws or band saws, they were cut into thinner boards. In the original sawed condition the 2″ x 2″, 2″ x 4″ or 2″ x 6″ had two flat parallel sides and were the product of a sawmill. Plaintiff has, therefore, established the merchandise to be lumber within the purview of headnote 2(a), supra.

The next aspect for consideration is plaintiff's principal claim that said merchandise is worked lumber. The definition of worked lumber in headnote 2(a) supra is as follows:

Worked lumber is lumber which has been matched (provided with a tongued-and-grooved joint at the edges or ends), shiplapped (provided with a rabbeted or lapped joint at the edges), or patterned (shaped at the edges or on the faces to a patterned form) on a matching machine, sticker, or molder. (Subpart B, Headnote 2(a)(iii)).

The uncontradicted testimonies of Mr. Paschick, Mr. Brice and Mr. Bennett establish the imported ramin matchsticks are made on a molder and are patterned, i.e., shaped at the edges. Mr. Johnson called by defendant testified the imported merchandise was worked lumber within the definition contained in headnote 2(a) supra based upon the testimony given by prior witnesses relating to its manufacture. Plaintiff has, therefore, established the imported merchandise to properly fall within the provision for hardwood worked lumber which is ordinarily sufficient to sustain its claim. However, under established case law an article may not be classified as lumber if it has been so processed as to become the article itself. *C. J. Tower & Sons* v. *United States,* 40 CCPA 30, C.A.D. 493 (1952); *United States* v. *C. S. Emery Co.,* 18 CCPA 208, T. D. 44399 (1930).

In *Tower* the importation consisted of wood cut according to specification to make up crate frames. The court therein made the following observation:

* * * that the wood was cut in accordance with the specifications to make up crate frames; that the wood was cut diagonally, halved or beveled, or what is known in the trade as shiplap; that no piece of the merchandise was straight cut on both ends; that the material as imported would go to make up the framework of the shipping crate as called for by the specifications; and that the pieces of lumber were shipped in bundles according to size, each bundle being numbered to correspond with the numbers set out in the blue print. [P. 32.]

The court concluded as follows:

Those arguments have been carefully considered by us but we are of the opinion, as was held below, that by reason of the cutting and shaping processes to which the material was subjected prior to its importation it was removed from the category of lumber and became a manufacture of wood dedicated to a definite and specific use and possessing a character and name completely different from the material out of which it was made. [P. 33.]

This case is distinguishable since the imported ramin reeds undergo substantial operations after importation. They are painted, stained or left in their natural state and are run through another shaking and drying process. The ramin reeds are combined with small wood slats and woven with yarns into rolls. These rolls are sold to converting jobbers who make them into various types of window shades, drapery or wall coverings, folding doors, room dividers, and other products. Therefore, the ramin reeds in their condition as imported are not dedicated to a definite and specific use.

The same reasoning is equally applicable in *Emery*, supra, which involved doorsills and stair rails.

The court in *Deringer* made the following comprehensive review of the issue of lumber and articles of wood.

We note at the outset that the tariff schedules here in question do not make a distinction between a manufacture of wood as such and lumber. Thus item 207.00—the tariff provision invoked by the government—provides not for manufactures of wood but rather for "articles" of wood. By contrast, earlier tariff acts did contain a specific provision for "manufactures of wood," as well as a provision for lumber not further advanced than sawed and planed lumber. But even under these earlier statutes, items such as those involved here were held properly dutiable as lumber rather than as manufactures of wood notwithstanding that they were known by a separate name other than "lumber" and notwithstanding that as a result of sawing and planing their character was so changed that they were useful for only a single purpose (as opposed to rough lumber which is useful for a multitude of purposes). Included among such items—which the courts classified as lumber rather than as manufactures of wood—were: Pieces of maple and spruce about 15 inches long by 4½ inches wide, wedge-shaped, partially sawed through lengthwise, partially planed, and used to

make cello, violin and viola tops, bodies and sides, *United States* v. *Gallagher & Ascher,* 12 Ct. Cust. Appls. 472, T.D. 40670 (1925); moldings, *Best-Moulding Corporation* v. *United States,* 51 CCPA 7, C.A.D. 829 (1963), and *Bailey-Mora Company, Inc., et al.* v. *United States,* 57 Cust. Ct. 99, 109–10, C.D. 2737 (1966); boards designed for use as inside ceiling, and boards chiefly used as siding for frame buildings, *United States* v. *Myers & Co. et al.,* 5 Ct. Cust. Appls. 541, T.D. 35179 (1915); stock solely used in the manufacture of sides of drawers for furniture, *B. A. McKenzie & Co., Inc.* v. *United States,* 39 Cust. Ct. 52, 56–57, C.D. 1903 (1957), and *Border Brokerage Co. et al.* v. *United States,* 52 Cust. Ct. 204, C.D. 2641 (1964); slats for blinds and screens, *Acme Venetian Blind & Window Shade Corp.* v. *United States,* 56 Cust. Ct. 563, C.D. 2704 (1966); boards intended to be used in the construction of silos, *C. S. Emery & Company* v. *United States,* 28 Cust. Ct. 303, C.D. 1427 (1952), tongued and grooved knotty pine paneling, *C. S. Emery & Company* v. *United States,* 41 Cust. Ct. 7, C.D. 2013 (1958); cedar pencil blocks, sawed to the proper dimensions for the purpose of making pencils and nothing else, *United States* v. *Young,* 15 Ct. Cust. Appls. 111, T.D. 42188 (1927). As this court pointed out in *Bailey-Mora Company* v. *United States, supra,* 57 Cust. Ct. at 109, the cases (under the earlier tariff acts) "establish[ed] the general rule * * * that a duty provision for lumber not further advanced than sawed and planed includes all forms of such lumber."

There is a caveat to what has been said however: If the lumber had been processed to the extent that *it itself* became the article for which the material was intended, then it was dutiable as a manufacture of wood and not as lumber.

In view of the foregoing and based upon the record, it is apparent the imported lumber has not been so processed as to remove it from the category of lumber and relegate it to the provision for articles of wood dedicated to a specific use.

Upon due consideration of the record and upon review of the authorities cited, the court is of the opinion that plaintiff has sustained its burden of proof and is entitled to judgment.

Judgment will be entered accordingly.